# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

CHARLENE FOUTS,

     Plaintiff,

v.                                 Case No. 8:23-cv-508-WFJ-NHA

AVELO AIRLINES, INC.,

     Defendant.

_____/

## ORDER

Before the Court is Defendant Avelo Airlines, Inc.'s ("Avelo Airlines")
motion for summary judgment and filings (Dkts. 40, 41, 42, 46), Plaintiff's
opposition (Dkts. 47, 48, 49), and Defendant's reply (Dkt. 55). After careful
consideration and review of the submissions of the parties and the applicable law,
the Court concludes the motion should be granted.

## I.     BACKGROUND

Plaintiff Charlene Fouts sues her former employer Avelo Airlines for
disability discrimination and retaliation under the Americans with Disabilities Act
("ADA"), 42 U.S.C. § 12101 *et seq.*[1] Ms. Fouts injured herself while performing
her duties as a flight attendant. She returned to work on light, desk duty as a newly

---

[1] Count III alleges a violation of the Florida Whistleblowers Act, and Count IV alleges a
violation of Florida's workers' compensation laws.

promoted supervisor of flight attendants and certain operations.  Ms. Fouts requested her own personal desk and office.  Before the desk arrived, Plaintiff received several negative performance evaluations.  Avelo Airlines terminated Ms. Fouts one month after she started her new, supervisory position.

On November 23, 2020, Ms. Fouts began working as a full-time flight attendant for Xtra Airways, which became Avelo Airlines in April 2021.  Dkt. 41 at 3.  On January 20, 2022, Plaintiff injured her shoulder, neck, and ribs while placing a passenger's luggage into an overhead bin.  Eleven days later, Plaintiff went to see Dr. Charles Munday.

Ms. Fouts first notified Defendant of her injuries on February 3, 2022, and her medical leave began.  Based on Dr. Munday's note, she would return to work without restrictions on February 21.  Dkt. 42-5 at 140.  Plaintiff did not return to work, and on March 3, she was seen by Dr. David Remmer.  Dkt. 42-5 at 141.  He released her to work on "light duty/desk duty" as of March 14, 2022.  The note indicated Plaintiff suffered from fractured ribs and a strained shoulder.  Plaintiff showed the note to her then supervisor, Fred Archambault.

During her medical leave, Ms. Fouts applied for a promotion to an Inflight Base Supervisor position on February 18, 2022.  Inflight Director Jeff Painter interviewed and selected her for the promotion.  Dkt. 42-5 at 8.  Mr. Painter knew that Plaintiff would be limited to "light duty/desk duty" upon returning to work.

Although Mr. Painter did not see Dr. Remmer's work restrictions note, Plaintiff told him that she could not fly or perform flight attendant duties upon her return to work. Mr. Painter assured her that the restrictions would "not [be] a problem" because the Inflight Base Supervisor position is a light-duty office job without a lifting requirement. Dkt. 42-5 at 8.

On March 14, 2022, Plaintiff returned to work as the new Inflight Base Supervisor in New Haven, Connecticut. She received a significant pay raise. She reported to the Inflight Base Manager, Tom Creatore, who in turn reported to Mr. Painter. Both Plaintiff and Mr. Creatore began their jobs about the same time, and neither was familiar with the New Haven base.

Plaintiff's duties included supporting flight attendants and operations, developing professional relationships with airport officials, positively representing Avelo, and effectively communicating and coordinating with crewmembers. Dkt. 42-5 at 92–95. At the outset, she told Mr. Creatore that she needed a desk and an office. Avelo Airlines does not generally assign Inflight Base Supervisors their own desks or offices. Dkt. 42-2 at 4. Mr. Creatore offered to pay for a lock and give Plaintiff a locker to store her belongings, but according to Ms. Fouts, no locker was available. Before the desk arrived, Mr. Creatore instructed Plaintiff to use the desks and tables in two particular rooms for her belongings and for interviews with employees. She complied.

3

During her month as supervisor, Plaintiff received several negative performance write-ups.  On March 17, Plaintiff decided to swap the lead flight attendant on a March 28 flight with an FAA safety inspector onboard.  Plaintiff was not authorized to make the switch, the change would cause the original lead flight attendant to receive less pay, and the action would violate the seniority-based bidding process and risk an FAA violation.  Dkt. 42-6 at 19, 49–50.  Also, on March 17 and on March 23, Plaintiff created problems by getting involved with pilot problems when her job was not to respond to pilot concerns.  Dkt. 42-6 at 50.  The pilots were to contact their own separate management.  In short, Plaintiff had difficulties setting boundaries between her job duties and her friendships with pilots and flight attendants.  *Id*.  She often showed favoritism with certain employees, which offended the others.

At an inflight departmental meeting led by Mr. Painter on March 23, Plaintiff interrupted to ask if he could tell her when she would be receiving her personal desk.  She placed Mr. Painter in an awkward position by bringing up her specific request in front of everyone in his department.  She admitted it was inappropriate.

Plaintiff's most egregious conduct occurred on April 1 on a flight from Tampa to New Haven.  When Plaintiff interviewed for the job in February, she told Mr. Painter that she would need to fly back and forth to Florida where her doctors

4

were located.  Dkt. 42-5 at 9.  According to Ms. Fouts, Mr. Painter suggested that on these travel flights between New Haven and Tampa, she "take notes, see how the crew is doing."  Dkt. 42-5 at 9.  On the April 1 flight, she was flying "positive space" as she was not on duty.  Nonetheless, she entered the flight deck, decided to check paperwork concerning a passenger's oxygen tank, which was the job of operations, and took the PA system over from the crewmembers.  Dkt. 42-6 at 50.  This flight was already weather-delayed in Tampa.

Apart from her violating company rules by taking over the duties of active crewmembers, Avelo Airlines received several customer complaints about the "blonde" woman who further delayed the Tampa flight and spoke in a rude tone over the PA system.  Dkt. 42-6 at 50–51.  Some of the passengers knew "the blonde" was not a flight attendant (she was not in uniform) and complained that "she thought she was in charge" and was "hysterical" as opposed to calming.  Dkt. 42-6 at 50–51.  Some passengers posted pictures or videos of Plaintiff on social media.  Despite these complaints and postings, two of the flight attendants now defend Plaintiff's actions and aver that, in their opinion, Plaintiff was not interfering with the crewmembers, acting as a flight attendant, or being rude to the crew.  Dkts. 49-2 (Jennifer Keller), 49-3 (Mathieu Bouyer).

On April 2, Plaintiff took over another matter unrelated to her job.  A customer service employee was having difficulty entering a non-Avelo pilot into

the system to fly as a jump seat rider. Dkt. 42-6 at 51. In an effort to ensure the pilot could immediately board, Plaintiff interjected herself into the situation when she had no ability to resolve the issue as an inflight employee. Dkt. 42-6 at 51.

On a day off, April 5, Plaintiff called Mr. Creatore after she spoke with a pilot who wanted her to demand crewmember Rob Dudchik stop taking a break in his car in the parking lot and start boarding a flight. Dkt. 42-6 at 51. Plaintiff was counseled for speaking to Mr. Creatore in a raised, unprofessional voice and refusing to listen to Mr. Creatore explain that pilots must contact their management, not Plaintiff, to deal with any issues involving crewmembers. Dkt. 42-6 at 51.

Mr. Creatore spoke with Mr. Dudchik about the parking lot incident. Mr. Creatore then gave Ms. Fouts a specific directive to email, not call, Mr. Dudchik about a different issue. Not only did she call Mr. Dudchik and talk to him about not leaving the flight area to go to the parking lot contrary to instructions, but she also emailed him about the parking lot issue. Dkt. 42-6 at 51. Mr. Dudchik complained to Mr. Creatore about how Plaintiff treated him "like a 5th grader." Dkt. 42-6 at 51. Although in the email Plaintiff did also mention the different issue concerning not discussing refunds with passengers, she acted in direct contravention to Mr. Creatore's directives not to discuss the parking lot issue with Mr. Dudchik.

Avelo Airlines terminated Ms. Fouts on April 13.  Defendant contends she was fired for deficient job performance in her role as supervisor.  Ms. Fouts argues that she was terminated because she suffered from a disability, failed to receive a reasonable accommodation, and was retaliated against for asking for a reasonable accommodation.

## II.    LEGAL STANDARD

Summary judgment is appropriate if 1) there is no genuine dispute as to any material fact and 2) the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  A fact is material if it may "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute means evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

The court must not "weigh the evidence and determine the truth of the matter" but should "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  It is not enough for the non-moving party to posit that "the jury might, and legally could, disbelieve the moving party's evidence." *Hinson v. Bias*, 927 F.3d 1103, 1115–16 (11th Cir. 2019) (citing *Anderson*, 477 U.S. at 256).  The non-moving party must present "affirmative evidence that would allow a reasonable jury to rule for [her]." *Id*. (internal quotation marks omitted).

The court must draw all reasonable inferences from the evidence in favor of the nonmoving party. *United States ex rel. Bibby v. Mortg. Inv. Corp.*, 987 F.3d 1340, 1346 (11th Cir. 2021) (citations omitted). An inference is reasonable if it is not based on pure conjecture and speculation. *Hinson*, 927 F.3d at 1115 (citation omitted); *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1982) (citations omitted). If a party attempts to create an issue of fact through an affidavit, that affidavit "may be disregarded if it 'flatly contradict[s]' earlier deposition testimony without explanation." *Pivac v. Component Servs. & Logistics, Inc.*, 570 F. App'x 899, 901 (11th Cir. 2014) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986)). There is a distinction, however, between discrepancies "which create transparent shams" and those "which create an issue of credibility or go to the weight of the evidence." *Id*.

## III.    DISCUSSION

Defendant seeks summary judgment on all four counts of the complaint. Defendant argues that Ms. Fouts fails to establish a *prima facie* case of ADA discrimination and to demonstrate that Defendant's legitimate, nondiscriminatory reasons for her termination are pretextual. With respect to ADA retaliation, Defendant contends that Plaintiff cannot establish a causal connection between any protected activity and her termination, that the reasons for termination are

pretextual, or that she would not have been terminated "but for" her alleged

protected activity.

## A.    Disability Discrimination

The ADA prohibits an employer from discriminating against "a qualified

individual on the basis of disability" concerning termination.  42 U.S.C. §

12112(a).  Because there is no direct evidence of ADA discrimination here, the

*McDonnell-Douglas* burden-shifting framework applies.  *Akridge v. Alfa Ins. Co.*,

93 F.4th 1181, 1191 (11th Cir. 2024).  To establish a *prima facie* case under the

ADA, Plaintiff must show that "(1) she is disabled, (2) she was a 'qualified

individual' when she was terminated, and (3) she was discriminated against on

account of her disability."  *Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir.

2016) (citation omitted).  Once the *prima facie* case is established, then the focus

shifts to pretext.

Defendant does not dispute that Ms. Fouts was disabled at all relevant times

and that her physical impairment resulted from her lifting a passenger's luggage to

the overhead bin.  Plaintiff meets the first prong of the *prima facie* case.

### 1.  *Qualified—Essential Functions*

Addressing the second prong, Avelo Airlines argues that Ms. Fouts was not a

"qualified individual" at the time of termination.  A "qualified individual" means

"an individual who, with or without reasonable accommodation, can perform the

essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

The essential functions are the "fundamental job duties of a position that an individual with a disability is actually required to perform." *Hill v. Clayton Cnty. Sch. Dist.*, 619 F. App'x 916, 920 (11th Cir. 2015) (quoting *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000)). "[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). The employer's judgment should be given substantial weight, but this single factor is not conclusive. *Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1258 (11th Cir. 2007) (citing *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1230 (11th Cir. 2005) and 29 C.F.R. § 1630.2(n)(3)(i)). Whether a function is essential is analyzed on a case-by-case basis. *Id*.

Avelo Airlines provided a written job description of Inflight Base Supervisor. Dkt. 42-5 at 92–95. The requirements include supporting flight attendants, handling all aspects of operations within the base, and promoting the company's "purpose, values, and vision." *Id*. at 92. The candidate must develop professional relationships with airport officials, represent the company "in a positive manner in all interactions," effectively communicate and coordinate with

10

all crewmembers, as well as influence, encourage, motivate, and support crewmembers in their performance, engagement, and growth. *Id.* The position also included filling in as a flight attendant as needed.

Defendant argues that Plaintiff failed to meet her job expectations. Plaintiff engaged in inappropriate and unprofessional conduct, including raising her voice and causing her supervisor Mr. Creatore to feel "threatened" during their March 23 meeting. Dkt. 42-5 at 104. While Plaintiff disagrees that her actions could have made him feel threatened, Mr. Creatore unequivocally believed her actions were inappropriate toward him as her direct supervisor. As uncontested examples, one flight attendant, Dolores Fonseca, wrote that Plaintiff ignored her, treated her rudely, and did not even know her name even though Plaintiff was her supervisor. Dkt. 42-8 at 139 (Ms. Fouts "did not make me feel like I mattered" but made me feel like "a nobody"). Crewmember Rob Dudchik complained to Mr. Creatore on April 7 that Plaintiff treated him "like . . a 5th grader, . . . [she] doesn't know how to talk to people. She barks at us and just seems so disingenuous every time she speaks." Dkt. 42-2 at 16; Dkt. 42-8 at 38.

In addition to these examples, a pivotal event occurred on April 1 when Plaintiff "flew positive space" from Tampa to New Haven. Dkt. 42-5 at 118. While flying off duty and out of uniform, she engaged in rude and disruptive conduct, which caused multiple passengers to complain about her behavior.

11

Plaintiff broke company rules by entering the flight deck numerous times and making announcements over the PA system, thereby usurping the crewmembers' roles. Plaintiff further delayed an already delayed flight during boarding to resolve a passenger's lack of documentation concerning an oxygen tank, which should have been referred to Airport Operations to handle.

Avelo Airlines received several complaints about the April 1 incident. One customer wrote a complaint and recalled that Plaintiff took over the loudspeaker and had "the rudest tone [the customer] had ever heard" and was "condescending and sarcastic." Dkt. 42-5 at 118–19. This passenger described Plaintiff as "hysterical" and the situation as "nerve-wracking."

These incidents and others were the subject of four negative performance reviews written by Mr. Creatore.[2] Dkt. 42-5 at 112–20. Plaintiff does not deny these events occurred but claims that the written performance counselings were embellished by Margaret Plummer of the Human Resources Department or by Mr. Painter. Mr. Creatore did testify that Ms. Plummer or Mr. Painter would sometimes rewrite or "embellish" his written counselings. Dkt. 42-8 at 40. The changes or embellishments, however, did not change the facts but, rather, the tone.

---

[2] Before drafting the performance notices, Mr. Creatore initially approached Margaret Plummer because he was having issues with Plaintiff's performance and needed to write her up. Dkt. 42-8 at 81.

12

The first and third reviews were not altered in any way. [3]  Dkt. 42-8 at 42, 48, 65,

140–41, 144–45.  Part of the second performance notice addressed an incident on

April 6 and was changed to use "much harsher" language than he had written.  Dkt.

42-8 at 43, 142–43.  The fourth and final performance notice, the written

separation, was also edited in a "harsher" tone.  Dkt. 42-8 at 48, 50, 146–49.

Despite the stylistic changes, Mr. Creatore testified that the facts in all four

performance notices were true, save one insignificant reference to 60 (instead of

15) seconds and the redating of some of the notices to reflect the date Ms.

Plummer signed off on them.[4]  Dkt. 42-8 at 70–72.  Plaintiff does not admit the

truth of everything in the written performance evaluations.  She asserts that she did

not do anything inappropriate, she did not mean to ignore or offend anyone.

It is settled law that an essential function of any position is "an employee's

ability to handle reasonably necessary stress and work reasonably well with

others."  *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1290 (11th Cir. 2002).  An

employee without these skills is not "otherwise qualified."  *Id.* at 1290–91

(citations omitted).  *Williams* involved an individual without a disability who

---

[3] Mr. Creatore accidentally emailed these two performance notices directly to Plaintiff without first sending them to Ms. Plummer and Mr. Painter.  Dkt. 42-8 at 50, 67–70.

[4] Plaintiff further downplayed the reviews because Mr. Creatore was instructed to document performance deficiencies from day one (March 14).  Mr. Creatore testified at his deposition, however, that he was never told what to put in his notes or evaluations.  Dkt. 42-8 at 18–19, 93–105.

argued that she had a "perceived" disability stemming from her inability to work with others, as she was insubordinate and engaged in threats of violence.

*Williams* and other cases address the inability to get along with others in the context of what is a qualified individual under the ADA.  *See*, *e.g.*, *Foley v. Morgan Stanley Smith Barney, LLC*, No. 0:11-cv-62476, 2013 WL 795108, at *6 (S.D. Fla. Mar. 4, 2013), *aff'd*, 566 F. App'x 874 (11th Cir. 2014) (finding financial advisor with bipolar disorder was not "otherwise qualified" at time of termination because he breached the security procedures concerning company assets and proprietary information as essential function of job); *Oliver v. TECO Energy, Inc.*, No. 8:12-cv-2117-T-33TBM, 2013 WL 6836421, at *6 (M.D. Fla. Dec. 26, 2013) (finding employee with a bipolar disorder not "qualified" where she could not conform her behavior to the essential functions of staying "calm, level-headed and resilient," maintaining "a strong customer service aptitude," and conveying "empathy as well as professionalism").

These cases share one distinguishing factor from the instant case: the real or perceived disabilities involved mental conditions or disorders that caused the disruptive behavior resulting in termination.  In *Foley*, "the issue [was] whether [Mr. Foley's] more recent unprofessional conduct rendered him otherwise unqualified."  2013 WL 795108, at *6.  On a "psychotic episode," he removed the hard drive from his work computer (deemed a trade secret) and took a colleague's

14

computer to a friend's house because he believed Morgan Stanley was spying on him. In *Oliver*, the plaintiff was often loud, rude, and nasty to TECO customers and co-workers, and she scared those around her. In *Williams*, the employee engaged in threats of violence including physically charging a co-worker with clinched fists. All three employees were found unqualified for the position based on their inability to work well with others.

Ms. Fouts' disability was not related to a mental condition or disorder. Her disability derived from workplace injuries to her shoulder, neck, and ribs. There is no indication that Ms. Fouts suffered from any mental disability, nor does either party suggest otherwise. The record is devoid of any evidence that her physical limitations of light desk work are somehow connected to her poor performance.

When Defendant gave Ms. Fouts the promotion on March 14, she possessed the technical skills of a flight attendant as well as some supervisory experience. That she was initially qualified for the job does not establish that she remained qualified at the time of her termination.

The issue here is whether Plaintiff's physical impairment requiring light, desk duty made her unqualified at the time of her firing. It did not. At no time before termination did Defendant require or ask her to serve as a flight attendant or lift heavy packages greater than 20 pounds. That she did not work well with employees, customers, and other airport personnel, which are essential functions of

her job, cannot be attributed to her shoulder injuries. For purposes of the *prima facie* case, Plaintiff was qualified for the position *under the ADA*. Plaintiff's disability requiring light, desk duty did not prevent her from performing the essential requirements of Inflight Base Supervisor.

2. *Reasonable Accommodation*

As part of a *prima facie* case of discrimination for failure to accommodate, a qualified individual must also establish that she made a specific request for a reasonable accommodation and that her employer failed to provide an accommodation or to engage in the interactive process. *D'Onofrio v. Costco Wholesale Corp.*, 964 F.3d 1014, 1021 (11th Cir. 2020), *cert. denied*, 141 S. Ct. 1345 (2021). An employer must make "reasonable accommodations" to an otherwise qualified employee with a disability "unless doing so would impose [an] undue hardship." 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9(a). The employee, however, must first identify and request an accommodation and demonstrate it is reasonable. *D'Onofrio*, 964 F.3d at 1022. Only then does the employer owe a duty to provide a reasonable accommodation or show undue hardship. *Frazier-White*, 818 F.3d at 1255–56 (citations omitted).

To be "reasonable," an accommodation must enable the employee to perform the essential functions of the job. *Owens v. Governor's Off. of Student Achievement*, 52 F.4th 1327, 1335 (11th Cir. 2022), *cert. denied*, 143 S. Ct. 2465

16

(2023); *Holly*, 492 F.3d at 1256. "[An] employer is not required to accommodate an employee in *any* manner that the employee desires—or even provide that employee's preferred accommodation." *Owens*, 52 F.4th at 1335 (quoting *D'Onofrio*, 964 F. 3d at 1022, citing *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997)).

Once the employee requests a reasonable accommodation, the employer must initiate an "informal, interactive process" in arriving at a workable reasonable accommodation. *Owens*, 52 F.4th at 1334–35; *Stewart*, 117 F.3d at 1287. Provided that an employer makes reasonable efforts to communicate with the employee, grants accommodations based on the information it possesses, and does nothing to obstruct this process, no liability arises. *Stewart*, 117 F.3d at 1287. The issue of whether the employee's action causes a breakdown in the interactive process is never reached if the employee does not give enough information to tie the requested accommodation to the specific disability. *Owens*, 52 F.4th at 1337.

Per her doctor's written note of March 3, 2022, Ms. Fouts was placed on "light duty/desk duty" as of March 14. Dkt. 42-5 at 141. The note did not contain an end date, but the follow-up visit was scheduled for March 31. *Id*. The diagnosis was rib fracture and shoulder strain. *Id*. The note did not mention any lifting or other restrictions—just light, desk duty.

17

While Plaintiff was out on medical leave in February, she interviewed with Mr. Painter for the promotion. She told Mr. Painter at that time that she had suffered a workplace injury and would not be able to fly as a flight attendant upon her return to work. Dkt. 42-5 at 8. Mr. Painter knew that Plaintiff had light duty/desk duty restrictions and could not fly or perform flight attendant duties or lift more than 20 pounds. Dkt. 42-3 at 2.

On March 14, when Ms. Fouts returned to work as an Inflight Base Supervisor, she requested her own personal desk or office. Avelo Airlines does not generally assign Inflight Base Supervisors their own desks or offices. Dkt. 42-2 at 4. Defendant asserts, and Ms. Fouts agrees, that she said she needed her own desk or office to *store her belongings* during the workday and for *privacy*. *See* Dkt. 42-8 at 15–16 (emphasis added). Ms. Fouts maintains, however, that she also told Defendant she specifically needed the desk and office to accommodate her pain (disability) by preventing her from having to carry around her heavy bag during the workday.

The first step is to ascertain whether, taken in the light most favorable to Plaintiff, her disability was linked to her request for a desk and office—was it sufficient under the ADA. *See Owens*, 52 F.4th at 1336. Plaintiff must ask for an accommodation that is both reasonable and tied to her disability. *See*, *e.g.*, *Moreira v. Am. Airlines, Inc.*, 157 F. Supp. 3d 1208, 1216 (S.D. Fla. 2016) (finding no

18

disputed facts where plaintiff failed to link his requests for a different desk to his disability rather than the desire to sit in a different location).  Plaintiff must explain to her employer "how the requested accommodation could alleviate the workplace challenges posed by her specific disability"—did she give Avelo Airlines "enough information to respond effectively to an accommodation request." *Owens*, 52 F.4th at 1335.

At her deposition, Plaintiff testified that when she returned to work in March, she told Mr. Creatore that she could not fly and could not lift anything and asked him for a "place to put my things other than carrying a heavy bag around." Dkt. 42-5 at 34.  In response, Mr. Creatore told her they were getting a desk.  *Id.* She admitted that her email to Mr. Creatore dated March 19 conveyed only that she wanted a desk, a place to put her things because she kept carrying them back and forth—not because her bag was heavy.  Dkt. 42-5 at 35.  The March 19 email reads:

> Hi Tom, I knew you're not working today, so this is for Monday. Please, please, please have them get me a desk. I'm fine with putting it across from yours. I need a place to put my things. I keep carrying them back and forth. Much appreciated. Charlene Fouts – HVN Inflight Supervisor.

Dkt. 42-5 at 142.

Mr. Creatore testified that he never knew that Ms. Fouts had any specific restrictions on lifting or repetitive motion.  Dkt. 42-8 at 19–22.  After a delivery

came in on March 19, he was told by Mr. Painter that Ms. Fouts could lift no more than twenty pounds. *Id*. at 20. Mr. Creatore did not know about her worker's compensation claim until April 7. *Id*. at 30–31.

According to Ms. Fouts, Mr. Creatore told her to use the crew room and the conference room for privacy in conducting her interviews or performance reviews with employees. Dkt. 42-5 at 34–35. She stated that the crew and conference rooms were unacceptable for storage of her personal items and work laptop because "everything could be stolen." Dkt. 42-5 at 35. Mr. Creatore offered her a locker to store her things during the day, but she testified that a locker was not available. Dkt. 42-5 at 35. Mr. Creatore had no recollection about the availability of lockers. There is no independent evidence of theft being a problem in the two rooms used by the inflight employees.

Plaintiff testified that on March 23 when she discussed her performance notice with Mr. Creatore, she informed him that it was painful with broken ribs to carry her heavy bag around, including a laptop, mouse pad, battery pack, in-flight manual, notepads, and her purse. Dkt. 42-5 at 13, 15, 30, 34–37. She also testified that she "needed a place to put [her] belongings when [she] went out to the aircraft . . . up to the top area to meet the flight attendant instead of carrying the bag around." Dkt. 42-5 at 13. Avelo Airlines ordered a desk for her around March 23. Dkt. 42-5 at 14.

20

Mr. Creatore's testimony and written notes indicate that he believed Ms. Fouts wanted her own desk because she thought she had earned one. She demanded a desk (and initially her own office) her first day. According to Mr. Creatore, she said more than once that she was the supervisor of the flight attendants, held a higher position than a "ramper," and deserved a desk and office of her own. Concerning the lack of office space, even for managerial positions, Plaintiff later admitted to Mr. Creatore:

> You asked if you got me a lock, would I move my things to a locker that was used by Jeff [Painter]. Originally, we thought that we would share your office, but you said that it was decided that there was not room [in the one office shared by two managers—Mr. Creatore and Base Manager, Operations Isaac Naylor]. After you brought this up I asked if I was not getting a desk. You said, "I don't know, that is Jeff's call." I did say that I needed a place to put my things, I didn't really care where it was. You did say that you couldn't imagine that I would not get a desk.
> . . . .
> I said that being in a new place, everyone needs a spot somewhere. I did say even the rampers have a spot and all the tables are spoken for in the crew room. You told me to go ahead and leave my stuff where it was and ask Jeff about the desk, so I did.

Dkt. 42-5 at 109.

In this email, Plaintiff expresses her desire for a "spot somewhere" because "even the rampers have a spot." She also acknowledges that sharing the managers' office would not work because it was too small. As she noted, she did ask Mr. Painter about the desk---when he was conducting a meeting with the entire inflight

department on March 23.  Dkt. 42-5 at 14–15, 104, 109–10.  Her actions during the meeting led to her first write-up.

Ms. Fouts denied at her deposition that her question directed to Mr. Painter at the meeting was inappropriate.  Dkt. 42-5 at 14–15.  In her own words, however, she said that when she asked, "will I be getting a desk," she could tell "by his reaction" that it was "not well-taken."  Dkt. 42-5 at 14.  In her email just after the meeting, Plaintiff wrote, "When I asked Jeff [Painter] in the meeting about the desk, *I realized that it seemed inappropriate*, so I called you [Mr. Creatore] to apologize. I did say that I hoped that you would not get into trouble for me asking Jeff about the desk."  Dkt. 42-5 at 110 (emphasis added).  Plaintiff admitted she wrote the email.  Dkt. 42-5 at 14, 109.  To the extent Plaintiff attempts to claim her conduct at the departmental meeting was acceptable, her own testimony inexplicably contradicts her written email.

No doubt there was much discussion about the desk—when was it going to arrive, if ever.  Indeed, another manager, Isaac Naylor, complained to Mr. Creatore that Plaintiff was never going to stop talking about the desk.  Dkt. 42-8 at 16, 96.  Even though Plaintiff did not clearly link her disability to the need for a desk or office, Defendant surely engaged, at the very least, in an informal, interactive process with Plaintiff.

For purposes of argument, the Court will assume that Plaintiff made clear to both Mr. Creatore and Mr. Painter that 1) she needed the desk as a repository for her heavy belongings to alleviate her pain when she carried them during the workday, and 2) she feared her belongings would be stolen if not secured, and a locker was unavailable.[5]  First, a personal desk or office is not a "reasonable" accommodation, nor did the doctor's note state that she needed a desk or office to perform "light duty/desk duty."  She was offered, and used, the desks and tables in the crew room and the conference room along with the other inflight employees.  There is no independent or corroborating evidence that personal items or work laptops were stolen in the two rooms.  The one, small office there was shared by two managers, and adding another desk was not advisable in an already tight space.

Second, in less than one month, and before her termination, her desk arrived.  She received her specific requested accommodation for a desk, although maybe not as speedily as she desired.  *See Terrell v. USAir*, 132 F.3d 621, 627–28 (11th Cir. 1998) (holding three-month delay in receiving personal keyboard was reasonable where plaintiff had some access to another keyboard).  In the meantime, Plaintiff used the desks and tables in the crew and conference rooms.

---

[5] According to Ms. Plummer, about 17 lockers were available at the time.  Dkt. 42-6 at 16 ("I know that there were 48 lockers available and we had 31 crewmembers working in airport operations.").  Other inflight employees used the table and desks in the conference room or crew room, and Plaintiff used them until her desk came on April 11.  Dkt. 42-5 at 12–13.

23

Third, Plaintiff was already permitted temporary excusal from performing the duties of a flight attendant, despite the position of Inflight Base Supervisor requiring that she fill in as a flight attendant if necessary. *See Holly*, 492 F.3d at 1256 (holding under the ADA that an employer does not need to eliminate an essential function of the plaintiff's job). Finally, even if any evidence shows that Avelo Airlines intended not to accommodate Plaintiff, she never describes a specific instance when she needed an accommodation and was denied one. *See Batson v. Salvation Army*, 897 F.3d 1320, 1326 (11th Cir. 2018). Plaintiff never told anyone at Avelo Airlines that she was asked to do work outside of any restrictions, and she never told anyone that she was performing work that violated any restrictions.

Notably, her actions on the April 1 flight belie her contention that her disability required that she have a desk. Neither Mr. Painter nor anyone else required Plaintiff, or gave her permission, to perform the duties of a flight attendant on these commuting flights.[6] She had even been instructed by Painter to "take notes" of the flight attendants' performance while she flew to and from New Haven to Florida. Nonetheless, she was able to board the flight with her belongings as well as take over some of the flight attendants' duties, contrary to

---

[6] Ms. Plummer, in HR, knew that Plaintiff was returning with a work-related injury but did not know the details of the injury or any restrictions. Dkt. 42-2 at 4.

24

Avelo Airlines' directives.  That two of the flight attendants stated that Plaintiff was not rude or hysterical is irrelevant to the fact that Plaintiff actually performed the duties of a flight attendant and made no mention of how it affected her disability.

Viewing all the evidence and drawing all reasonable inferences from the evidence in Plaintiff's favor, her claim for failure to provide a reasonable accommodation falls short.  There is no evidence to support a jury's finding that the request for desk and office was reasonable, linked to her disability, or denied.

### 3. *Causation*

Under the ADA, "but-for causation requires an employee to show that a cause was outcome determinative, meaning that a particular outcome would not have happened 'but-for' the purported cause." *Akridge*, 93 F.4th at 1192–93 (internal quotation marks and citations omitted).  Of course, "there can be multiple but-for causes of an adverse employment action." *Id*. at 1200.  "Because there can be more than one but-for cause for an adverse employment action, an ADA claimant need only show that her disability was one such cause, i.e., one 'determinative . . . decision-making factor.'" *Id*. at 1200.

Importantly, terminating an employee with a disability does not necessarily mean that it was based on the disability. *Oliver*, 2013 WL 6836421, at *9.  For termination to be based on the disability, the decision-maker must be aware of the disability. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1186 (11th Cir. 2005)

("[A] decision-maker who lacks actual knowledge of an employee's disability cannot fire the employee 'because of' that disability."). Of the four potential decision-makers, the parties disagree on what each knew, and precisely who was the final decision-maker, if there was one only.

Vicky Stennes, Director of the HR department, gave final approval of the termination after reviewing the reasons set forth in the final, separation notice— poor performance and conduct, including the disruptive behavior on the April 1 flight. Dkt. 42-4 at 2, 5–8. Ms. Plummer, another HR member, reported to Ms. Stennes and recommended Plaintiff's termination.

Mr. Creatore supervised Plaintiff, but he did not have the final authority to fire her. Mr. Creatore agreed that although he was not the final decision-maker, Plaintiff's numerous performance issues during a short period of time warranted her termination, particularly after her conduct on the April 1 flight. Dkt. 42-8 at 75–76. He did not support her termination until the news of the April 1 flight incident. He did not know that a worker's compensation claim existed until April 7. At some point, he learned of Plaintiff's inability to lift 20 pounds from Mr. Painter.

Having hired Plaintiff, Mr. Painter knew that Plaintiff had been injured at work and he told her that she would not be required to fly as a flight attendant in her supervisory position. Ms. Stennes, not Ms. Plummer, would have approved the

26

decision to hire Plaintiff.  Dkt. 42-6 at 10–11.  Ms. Plummer was aware that Mr. Painter hired Plaintiff "knowing [Plaintiff] will not be able to step in as a flight attendant if we needed her."  Dkt. 42-6 at 6.  This constituted a modification of the inflight supervisor duties in that Plaintiff, at least temporarily, would not be required to work as a flight attendant.  Dkt. 42-6 at 6.  Ms. Plummer testified that she was unaware of the type of injury Plaintiff suffered, any work restrictions apart from Mr. Creatore saying that Plaintiff could not lift 20 pounds, or a doctor's note for Plaintiff.  Dkt. 42-6 at 5, 6, 9, 11–12.  Ms. Plummer routinely spoke with Mr. Creatore about the performance issues he was having with Plaintiff, and Ms. Plummer reviewed some of the written performance evaluations.

Undoubtedly, by the time she was terminated on April 13 all these individuals knew Plaintiff had a disability.  While they were aware at differing times that she was hired as Inflight Base Supervisor and would not be required to act as a flight attendant for a time, most of them never saw the doctor's note.  Even if they did, the note did not set forth any lifting or repetitive movement restrictions.  No box on the note was checked, and the only handwritten notation was light, desk duty.

Furthermore, there is no evidence that she complained about her disability other than initially telling Mr. Creatore she was in pain from carrying around her belongings, laptop, and flight manual all day.  Avelo Airlines did not require her to

do so.  They offered the desks and tables in two rooms and ordered her own personal desk.  Absent is evidence that anyone decided to terminate her because of her disability.  Indeed, Ms. Fouts admits that she never complained to anyone at Avelo Airlines, and definitely not to human resources, that she was being discriminated against on the basis of her disability.  Dkt. 42-5 at 38.

Plaintiff was not terminated for her inability to lift over 20 pounds or her temporary inability to function as a relief flight attendant.  Poor performance, disruptive behavior, and failure to correct her deficiencies were stated as the reasons for her termination.  Applying the "but-for" test, Plaintiff has failed to prove that she would not have been terminated but for her disability.

### 4. *Pretext*

Defendant's legitimate, nondiscriminatory reason for termination was Plaintiff's failure to correct repeated performance and behavioral issues as set forth in the written performance notices.  "An employer's honest, good-faith belief that an employee violated its policies is a legitimate reason for termination even if the employer's belief may have been mistaken or wrong."  *Lee v. Safe-Dry Carpet & Upholstery*, 2021 WL 3829028, at *3 (11th Cir. Aug. 27, 2021) (unpublished order) (citation omitted).  Poor performance or behavior and insubordination satisfy the employer's "exceedingly light" burden of showing a legitimate nondiscriminatory reason.  *See Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994).

28

Turning to pretext, the employee carries the burden of "cast[ing] sufficient doubt" on the articulated nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered reasons were false and that discrimination was the true motivation behind the termination. *Phillips v. Legacy Cabinets*, 87 F.4th 1313, 1323–24 (11th Cir. 2023) (citation omitted). Specifically, a plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993); *Ring v. Boca Ciega Yacht Club Inc.*, 4 F.4th 1149, 1163 (11th Cir. 2021) (citing *St. Mary's*). To avoid summary judgment, the plaintiff must present evidence for a reasonable jury to conclude "not just that the employer's proffered reasons for firing her were ill-founded but that unlawful discrimination was the true reason." *Phillips*, 87 F.4th at 1323 (quoting *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1267 (11th Cir. 2010)).

The employee must meet the employer's reason "head on and rebut it" without arguing over the wisdom behind it. *Chapman v. Al Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (*en banc*). A plaintiff's failure "to rebut even one nondiscriminatory reason is sufficient to warrant summary judgment for the

employer." *Smelter v. Southern Home Care Servs. Inc.*, 904 F.3d 1276, 1290 (11th Cir. 2018).

Focusing on the employer's honest beliefs, and not the employee's own perceptions of her performance, the Court finds that Plaintiff fails to survive summary judgment on the issue of pretext. Ms. Fouts believed she was a good employee. Standing alone, this belief is insufficient to rebut that Avelo Airlines' supervisors and decision-makers considered her a difficult employee. *See Rutledge v. Vengroff Williams, Inc.*, No. 8:22-cv-1782-VMC-SPF, 2023 WL 5607586, at *11 (M.D. Fla. Aug. 30, 2023) (granting summary judgment where all decision-makers believed plaintiff had performance issues even though one also believed there was an issue with medical paperwork).

Plaintiff attempts to rebut the facts supporting her insufficient performance reviews. Primarily, she relies on the affidavits of two of the flight attendants on the April 1 flight, Ms. Keller and Mr. Bouyer. *See* Dkts. 49-2, 49-3. In their opinions, Ms. Fouts was assisting with the passenger's lack of documentation for oxygen and did not interfere with the crewmembers performing their duties or act as lead flight attendant. Both found Mr. Creatore's written summarization inaccurate, and both averred that Ms. Fouts was polite, cordial, and professional, including on the April 1 flight. While these co-workers believed Plaintiff was helping them on the flight, the passengers did not see it that way. Several written complaints were lodged,

30

including letters and postings to social media. Plaintiff does not contest that customers complained about her rude tone on the flight, and one complaint included a photograph of Plaintiff. Dkt. 48 ¶¶ 48–49; Dkt. 42-2 at 6–7, 17–24.

Even if the April 1 incident were exaggerated in the write-ups, or even false, Defendant's sincere belief that they occurred would not be called into question. *See Frazier v. Sec'y, Dep't of HHS*, 710 F. App'x 864, 871 (11th Cir. 2017) (unpublished opinion) (citations omitted). "That a plaintiff's evidence suggests that an employment decision was unwise or unfair or inaccurate does not alone suggest that it was discriminatory or retaliatory." *Id*. (citing *Alvarez*, 610 F.3d at 1266–67). Plaintiff does not refute that she spoke over the PA system, walked in and out of the flight deck, or decided to take over the issue concerning the passenger's documentation of the oxygen. To the extent two flight attendants perceived her as assisting them, protocol required that an employee flying "positive air space" permit the assigned crewmembers to work the flight. In her own words, Plaintiff said that Mr. Painter told her to "take notes" and observe the performance of the flight crew when she traveled back and forth from New Haven to Tampa.

Additionally, Plaintiff has failed to rebut at least one other reason or documented incident of poor performance or insubordination. Plaintiff made two phone calls to switch out the lead flight attendant on a March 28 flight. The voice

recordings are in this record.  *See* Dkt. 46.  Plaintiff made this decision without authority and circumvented the settled bidding process that took seniority into account.  The consequences were twofold: 1) the original lead flight attendant would lose pay; and 2) the company would violate FAA procedure.

Nor does Plaintiff contest the written complaints by two other co-workers and supervisees, Ms. Fonseca and Mr. Dudchik.  *See* Dkt. 48 ¶¶ 38, 42.  They believed Plaintiff was rude, condescending, and demeaning to them and generally did not know how to talk to people.  *See* Dkt. 42-8 at 37, 139; Dkt. 42-2 at 5, 16. These crew member accounts of Plaintiff's rude behavior support Defendant's sincere belief of inappropriate behavior.

Another unrebutted reason entails Plaintiff's actions at the inflight departmental meeting when she asked Mr. Painter mid-meeting when she would be getting her own desk.  She admitted that her conduct was inappropriate.  She does not deny that she spoke with pilots about issues they were having with crewmembers and that she called the crewmembers or Mr. Creatore to abide by the pilots' wishes.  Dkt. 42-5 at 106.  She does not deny that she failed to follow Mr. Creatore's directives concerning emailing, not telephoning, Mr. Dudchik about never discussing refunds with customers, to refer them to the appropriate department.  Plaintiff does not deny that she attempted to usurp Provisioning

Specialist Monique Payne's role to assure a pilot could fly "jump seat" on the next flight.  Dkt.  42-5 at 119.

Even if Defendant offered any additional reasons for its employment decision, which it does not, such additional reasons do not provide an inconsistency.  *See Rutledge*, 2023 WL 5607586, at *12.  None of the four individuals who at some point had input into the termination decision gave a discriminatory reason, and Plaintiff has provided no evidence to the contrary. Plaintiff has failed to rebut each of the articulated reasons for her termination. Finally, the temporal proximity between starting as inflight supervisor on March 14 and her termination decision April 13 do not establish pretext.  *See Graves v. Brandstar, Inc.*, 67 F.4th 1117, 1124 (11th Cir. 2023) (holding in ADA claim, temporal proximity alone is insufficient to defeat summary judgment); *Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1328 (11th Cir. 2020) (holding that temporal proximity of less than two months was insufficient to establish pretext). Accordingly, summary judgment is granted on disability discrimination.

**B.    ADA Retaliation**

A retaliation claim under the ADA requires a showing that "(1) she engaged in a statutorily protected expression, (2) she suffered an adverse employment action, and (3) there was a causal link between the two."  *Frazier-White*, 818 F.3d at 1258.  The causal link "requires a showing of but-for causation."  *Id*. (citing

33

*Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).  This element is

broadly construed, and the plaintiff need only prove that the protected activity and

negative employment action are "not completely unrelated."  *Goldsmith v. Bagby*

*Elevator Co.*, 513 F.3d 1261, 1278 (11th Cir. 2008) (citations omitted).  The

plaintiff must show that the decision maker was aware of the protected conduct at

the time of the adverse action."  *Goldsmith*, 513 F.3d at 1278.

Defendant argues that Plaintiff cannot establish the third prong of the *prima*

*facie* case, that Avelo Airlines' legitimate, nondiscriminatory reasons are

pretextual, or that she would not have been terminated "but for" her alleged

protected activity.  To establish the third prong, Plaintiff must identity the

statutorily protected expression and establish that a link ties the expression to her

termination.

As discussed earlier, Plaintiff did not establish that she made a reasonable

request to accommodate her disability.  Plaintiff's stated reasons for the desk or

office stemmed from her desire for privacy and for a place of her own to store her

things as a newly promoted supervisor.  Unless she requested a reasonable

accommodation, any requests she made are not protected by the ADA.  *Cf. Hughes*

*v. Wal-Mart Stores East, LP*, 846 F. App'x 854, 858 (11th Cir. 2021) ("An

employee participates in a protected activity when she makes a request for a

reasonable accommodation.").  Plaintiff never linked the requests for a desk or

34

office to her alleged disability—that she needed her own desk or office to store her belongings during the workday because of her injury and without that desk she was unable to perform her job duties.

For retaliation, the causal connection between the accommodation request and her termination may not be shown by temporal proximity alone. *See Hankins v. AirTran Airways, Inc.*, 237 F. App'x 513, 520 (11th Cir. 2007) (discussing temporal proximity under Title VII retaliation); *Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1219 n.7 (11th Cir. 2021) (noting that ADA discrimination and Title VII case law are often cited interchangeably based on the similarity of statutes and framework analysis). In *Hankins*, the temporal proximity between the claimed protected expression and termination was only 20 days. There, a failure to meet performance standards set by the plaintiff's employer and her flagrant act of misconduct "broke the causal connection (if any) between the protected activity and her termination." *Hankins*, 237 F. App'x at 521; *see also Militano v. Randstad Professionals US, LP*, No. 14-21285-CIV, 2015 WL 1636115, at *24 (S.D. Fla. Apr. 13, 2015) (finding that under the ADA, plaintiff's insubordinate conduct five days after she complained to HR was sufficient to break the causal link).

Here, Ms. Fouts never complained to anyone about being discriminated against on the basis of her physical impairment. Nor did she rectify her poor conduct issues and, instead, continued to engage in disruptive behavior. These

intervening factors severed the causal chain.  Consequently, Plaintiff has not established a *prima facie* case of retaliation.

As to pretext, as discussed in the prior section, the evidence does not demonstrate that Avelo Airlines' reasons for termination were either false or motivated by a retaliatory intent under the *McDonnell-Douglas* framework or the "convincing mosaic" approach.  *See DeLaughter v. Verizon Commc'ns, Inc.*, No. 6:22-cv-2370-JSS-DCI, 2024 WL 4956730, at *13 (M.D. Fla. Dec. 3, 2024) (citing *McCreight v. AuburnBank*, 117 F.4th 1322, 1335 (11th Cir. 2024)).  The temporal proximity between her request for a desk and termination is insufficient by itself to prove Avelo Airlines' reason to let her go was pretextual.  *Cf. Adamson v. City of Birmingham*, No. 24-11201, 2024 WL 5088414, * 5 (11th Cir. Dec. 12, 2024) (unpublished opinion) (holding that seven days alone, while perhaps sufficient to show causation, was insufficient to prove pretext).  Less than a month does not amount to "suspicious timing" to show a convincing mosaic of evidence that Plaintiff was fired for a retaliatory reason.  *See Adamson*, at *6.

Lastly, Plaintiff cannot show that she would not have been terminated but for her request for the desk or office.  Defendant is granted summary judgment on the ADA retaliation claim.

**C.    Retaliation under the Florida Private Sector Whistle-Blower's Act**

36

Count III alleges a claim for a violation of section 448.102(3) of the Florida

Statutes.  Section 448.102(3) provides:

> An employer may not take any retaliatory personnel action against an
> employee because the employee has:
> . . . .
> (3) Objected to, or refused to participate in, any activity, policy, or
> practice of the employer which is in violation of a law, rule, or
> regulation.

The complaint alleges the following facts:

> Plaintiff witnessed and objected to an airline Captain and First Officer
> smoking on an aircraft during a flight, which is violation of federal law,
> and specifically 49 U.S. Code § 41706; as well as 14 C.F.R. Part 252 (§
> 252.4). Plaintiff reported her objection to this activity to her supervisor
> and manager, she was told not to report this issue to the Federal Aviation
> Administration, and was thereafter told that she had "failed" to report
> this issue as she was required to do.

Dkt. 1 ¶ 10.  Plaintiff claims she was terminated in retaliation for "failing to

properly report" a pilot for smoking during a flight.  Smoking on a flight is a

violation of federal airline regulations.

On August 11, 2021, Plaintiff reported a pilot for smoking during a flight.

Dkt. 42-6 at 56.  She called the chief pilot at Avelo Airlines from the plane to

report the incident at the time it was occurring.  Dkt. 42-5 at 29, 121.  Ms. Fouts

was one of two members of the crew who reported the pilot's smoking in the flight

deck.  Dkt. 42-6 at 22, 56.  Ms. Plummer investigated the smoking report.  Dkt. 42-

6 at 22.  Avelo Airlines terminated the pilot in September 2021.  Dkt. 42-2 at 13

(pilot's termination letter).

At the request of Avelo Airlines, Ms. Fouts emailed her report of her observations of the smoking incident.  Dkt. 42-5 at 121.  On September 2, 2021, she wrote:

> The smoking incident happened on a charter flight.  We were ferrying to pick up the clients.  [Pilot] came out of the flight deck to get a cup. He took my used coffee cup from the trash and returned to the flight deck and closed the door. . . . I was resting when I smelled the smoke. I sat up and the rest of the crew came forward. . . . We all knew that it was cigarette smoke. It filled the cabin. . . .  We discussed it as a group, myself, Shelly, Devon, and Everett. We decided that I would call Tony Taype as soon as we had a signal. I did this, and then I went and confronted the pilot. I could hear Tony on the phone yelling at [the pilot] when I went into the flight deck. After he hung up I said that I was sorry, but he put us all in a scary situation. [The pilot] was very angry.

Dkt. 42-5 at 121.

At her deposition, Ms. Fouts initially testified that no one told her that she had failed to report the incident as required.  Dkt. 42-5 at 29.  She was then shown her interrogatory answers and questioned what she meant when she answered that Mr. Taype told her not to make a report for the FAA.  Dkt. 42-5 at 29.  Then she responded at deposition that she was told later, over the phone, to report it.  Dkt. 42-5 at 29.  She explained that her email did not constitute a report and that "months later" she was asked to prepare a report.  Dkt. 42-5 at 29–30.

This testimony is confusing and unclear.  She immediately reported the incident by calling Mr. Taype, and she wrote her observations in an email three weeks later.  Mr. Painter was aware that Ms. Fouts immediately reported the

incident and agreed that Ms. Fouts was required to report the incident, as she did.

Dkt. 42-7 at 12, 24.  Ms. Fouts submits no additional evidence or explanation

about what she means that she was initially told by Avelo Airlines not to report the

incident to anyone else, but later she was admonished for failing to properly report

the incident.  Dkt. 47 at 16; Dkt. 42-5 at 126.

To the extent Plaintiff contends she was terminated for reporting, or failing

to properly report, the smoking incident, there is no close temporal proximity.

Plaintiff even concedes that seven or eight months (August or September 2021 to

April 2022) is remote.  Dkt. 47 at 16.  This record does not support any genuine

issues of material fact concerning retaliation under Florida's Whistle-Blower's Act.

### D.    Workers' Compensation Retaliation

Plaintiff alleges that Defendant terminated her in retaliation for filing a valid

claim for workers' compensation benefits, which violates section 440.205 of the

Florida Statutes.  Her complaint states:

> Following Plaintiff's work-related injury and return from medical leave
> in March of 2022, Defendant . . . intimidated, coerced, and discharged
> Plaintiff from her employment  . . . by reason of Plaintiff's valid claim
> and attempt to claim compensation benefits under Chapter 440, Florida
> Statutes.

Dkt. 1 ¶ 35.  The *McDonnell Douglas* burden-shifting framework applies to a

claim under section 440.205, which shares the same elements as employment

retaliation claims under federal law. *Pennell v. Judd*, No. 8:19-cv-2433-CEH-TGW, 2022 WL 3345630, at 32 (M.D. Fla. Aug. 12, 2022) (citations omitted).

A *prima facie* case under section 440.205 requires that the plaintiff show she engaged in protected activity, faced an adverse employment action, and the two were causally related. *See Juback v. Michaels Stores, Inc.*, 696 F. App'x 959, 960 (11th Cir. 2017) (citing Florida cases). According to the parties, Plaintiff submitted her workers' compensation claim to Avelo Airlines on February 3, 2022. Dkt. 41 ¶ 19. She signed and completed a Statement of Employee Form stating that she first notified her supervisor on February 4. *Id*. She was released by the workers' compensation doctor to return to work on light, desk duty on March 14, 2022. Dkt. 41 ¶ 21; Dkt. 42-5 at 33. She was fired on April 13. Accordingly, Plaintiff has demonstrated the first two elements of the *prima facie* case.

As in her previous retaliatory claims, temporal proximity between her workers' compensation claim and her termination does not prove causation. A claim was filed early February, and she was terminated over two months later.[7] Her numerous performance and behavioral incidents, as discussed and examined earlier, constitute intervening acts of misconduct sufficient to break the causal

---

[7] Here, the Court assumes early February as the operative date to determine temporal proximity but recognizes the cases cited by Defendant concerning specificity of dates. *See Chavous v. City of St. Petersburg*, 576 F. Supp. 3d 1040, 1064 (M.D. Fla. 2021) (failing to plead the day she received benefits or "precise day [s]he initially requested workers' compensation benefits for each injury in [her] complaint" is fatal), *aff'd*, 2024 WL 366243 (11th Cir. Jan. 31, 2024); *McGuire v. United Parcel Serv., Inc.*, 763 F. App'x 890, 899 (11th Cir. 2019).

chain between the protected activity and termination.  Nor has Plaintiff shown her poor performance and conduct were pretextual reasons for her termination.

Apart from retaliatory discharge under Florida's Workers' Compensation Act, Plaintiff contends that she also states retaliatory intimidation or coercion, which does not require a discharge.  Dkt. 47 at 17 (citing *Chase v. Walgreen Co.*, 750 So. 2d 93, 95–98 (Fla. 5th DCA 2000)).  To this end, it is unclear what facts she relies on other than the allegations in her complaint to show intimidation and coercion.[8]  *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (holding opposition to claim abandoned on summary judgment where nonmoving party relies on the allegations in complaint).  Thus, Plaintiff cannot defeat summary judgment on the workers' compensation claim.

## CONCLUSION

Defendant's motion for summary judgment (Dkt. 40) is granted.  The Clerk is directed to enter final summary judgment in favor of Defendant and against Plaintiff and to close the case.

**DONE AND ORDERED** at Tampa, Florida, on March 24, 2025.

**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO:**
Counsel of record

---

[8] Her attempt to argue that Defendant intimidated Mr. Creatore is unavailing.  *See* Dkt. 47 at 19. Plaintiff must show that she herself was intimidated or coerced.